**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

JANICE RAMOS,                          *
                                       *
      Plaintiff,                       *
                                       *
vs.                                    *    Civil Action No. 04-00742-BH-B
                                       *
JO ANNE B. BARNHART,                   *
Commissioner of                        *
Social Security,                       *
                                       *
      Defendant.                       *

## REPORT AND RECOMMENDATION

Plaintiff Janice Ramos ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Oral argument was held on October 18, 2005.  Upon consideration of the administrative record, oral argument and the memoranda of the parties, it is the recommendation of the undersigned that the decision of the Commissioner be **AFFIRMED.**

## I.   Procedural History

In January 1999, Plaintiff protectively filed an application for supplemental security income benefits alleging that she has been disabled since October 16, 1998 due to nerves, migraine headaches and "slow learning."  (Tr. 531-534, 573-576). Plaintiff's claim was denied initially on May 21, 1999, and upon

reconsideration on August 19, 1999.  (<u>Id</u>. at 535-544).  Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ").  (<u>Id</u>. at 545-556).  On March 9, 2000, a <u>de novo</u> administrative hearing was held before ALJ Joseph J. Micare ("ALJ Micare") which was attended by Plaintiff, her representative, and Dr. John William Davis, a medical expert.  (<u>Id</u>. at 579-608).  A supplemental hearing was held on June 5, 2000, which was attended by Plaintiff, her representative, Dr. John William Davis, a medical expert, and Fred Shriber, a vocational expert ("VE").  (<u>Id</u>. at 557-572, 609-634).

On October 20, 2000, the ALJ denied Plaintiff's initial application.  (<u>Id</u>. at 442-454).  On October 30, 2000, Plaintiff again applied for supplemental security income and on December 15, 2000, filed an application for Child's Insurance Benefits ("CIB") under Section 202(d)(1) of Title II of the Act, 42 U.S.C. § 402(d)(1).  (Tr. 24, 59-61).  Plaintiff also requested review of the ALJ's October 20th decision, and on September 13, 2002, the Appeals Council ("AC") remanded the case for further proceedings.  (<u>Id</u>. at 474-476).  The AC also consolidated Plaintiff's appeal with her second disability application.  (<u>Id</u>.)  A third administrative hearing was conducted by ALJ Warren L. Hammond ("ALJ Hammond") on January 2, 2003.  (<u>Id</u>. at 502-530).  The hearing was attended by Plaintiff, her representative and Richard Freeman, a VE.  (<u>Id</u>.)  ALJ Hammond issued a decision on February 28, 2003, wherein he

found that Plaintiff was not disabled, and therefore denied both of her disability applications. (Id. at 21-32). Plaintiff filed an appeal, and on October 25, 2004, the AC denied Plaintiff's request for review and the decision became final. (Tr. 3-5, 19-20). 20 C.F.R. §§ 404.981, 416.1481. The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.  __Background Facts__

Plaintiff was born on May 22, 1979 and was 23 years of age at the time of the third administrative hearing. (Tr. 507, 582, 612). Plaintiff has an 11th grade special education and has no past relevant work experience. (Id. at 64, 69, 486, 507-508, 583-584).

At the March 9, 2000 administrative hearing, Plaintiff testified that she was not married and had no children. (Id. at 582). Plaintiff completed the 11th grade, and has been in EMR special education classes since the 3rd grade. (Id. at 507-508, 582-584). According to Plaintiff, she learned to read and write "a little bit;" however, she still requires assistance. (Id.) At the hearing, Plaintiff testified that she had never worked, did not have a driver's license, and lived with her mother who provided financial assistance to her. (Id.)

Plaintiff indicated that she was receiving treatment every 2

weeks, for problems due to nerves, depression[1] and migraine headaches (with dizziness),[2] from Dr. Evans of the Mobile County Health Department ("MCHD"), and was taking Zoloft and Vicoprofen for her nerves. (Tr. 584-594). Plaintiff also reported that she had been treated for depression at the Mobile Mental Health Center ("MMHC"), with group therapy and counseling (once a month), since October 14, 1999, and was seeing Dr. Joshie for her nerves. (Id. at 587-594).

According to Plaintiff, she spent most of her time at home, although she would ride along with her mother to the store and other places. (Id. at 592). Plaintiff indicated that she had neither worked nor sought to work because she does not feel comfortable working due to her nerve problems and her inability to read or follow directions. (Id. at 592-593). She also indicated that while she could probably wash dishes, she would be nervous and would likely "break them." (Id. at 594).

At the second administrative hearing conducted on June 5, 2000, Plaintiff testified that she was being treated by Dr. Joshie at MMHC once every 2-3 weeks for therapy/counseling, and by Dr. Evans at the

---

[1]Plaintiff testified that on a daily basis she suffers from depression, lack of energy, sleep deprivation, bad nerves, dizziness, seeing shadows/black spots floating out of the corners of her eyes, etc. (Id. at 591). She has been prescribed Prozac and Risperdal for her depression and testified that the medication helps "a little bit." (Id.) She takes Risperdal to help her sleep. (Id.)

[2]Dr. Evans had Plaintiff checked for seizures and none were found. (Id. at 585).

County Board of Health.  (<u>Id</u>. at 612-613, 615-617).[3]  Plaintiff
testified that there had been no change in her condition/medication,
that she takes Risperdal and Zoloft, and that she was living with
her cousins, who took care of the rent.  (Tr. 614-615).  Plaintiff
reported that her group therapy/medication helped sometimes,
although she still gets really nervous and does not feel well.  (<u>Id</u>.
at 614-617).  Plaintiff also reported that she continues to have
frequent visual hallucinations and that she talks with imaginary
friends.  (<u>Id</u>. at 618-619).

As for her daily activities, Plaintiff testified that she does
not leave the house much, except to go to her grandmother's house
or the store.  (<u>Id</u>. at 620).  Plaintiff reported that she does not
have any friends; however, her cousin takes her to visit her family.
(<u>Id</u>. at 620-621).  Plaintiff took issue with the reports of two
physicians who indicated that she had told them that she did not
want to work because her stepfather could support her, or that she
was only interested in getting a check.  (<u>Id</u>. at 619).  Plaintiff
also took issue with a report from MMHC indicating that she had bad
nerves because she was raped and/or abused by a roommate.  (Tr. 621-
622).  Plaintiff testified that she was actually abused by a family
member, not a roommate.  (<u>Id</u>. at 622).

---

[3]Notwithstanding Plaintiff's assertion, the record reflects only one
treatment note, dated April 3, 2000, was added to the record for this time
period.  (<u>Id</u>. at 614).

At the third administrative hearing held on January 2, 2003, Plaintiff testified that she does not have any vocational or military training, that she has never worked or attempted to do so, and that her family supports her. (Id. at 507-509). Plaintiff reported that she cannot work because she is "real slow" and that she is unable to count money, read or "catch on" to how to do things. (Id. at 509). Plaintiff acknowledged that she knows how to make a bed, clean a bathroom and sweep, but indicated that she does not help out with household chores. (Id. at 509-511). According to Plaintiff, she just lays around and watches television all day or sleeps due to her headaches and "different stuff." (Id. at 510-511). At one point, Plaintiff indicated that she is not capable of working, but later acknowledged that she does not know why she could not work as a hotel maid making beds. (Tr. 511).

Plaintiff testified that she had stopped receiving any mental health treatment, and that she was being treated at the MCHD for headaches and bad nerves. (Id. at 512-513). Plaintiff reported that she takes medicine when she can afford to do so; however, she was unable to recall the last time she had taken any. (Id.) She also reported that she had not been hospitalized in the past 12 months. (Id. at 513). Plaintiff indicated that she saw Dr. Smith at the Franklin Clinic in March for back pain, but could not afford

the medicine he prescribed.[4]  (<u>Id</u>. at 513-515).

Plaintiff also testified that she is able to feed, bathe and dress herself.  (<u>Id</u>. at 516).  She also indicated that she can empty the trash, walk to the store across the street, do some grocery shopping and cook a little.  (Tr. 516-517).  She does not have a license and does not know how to drive a car.  (<u>Id</u>. at 517).  She reported that she cannot stand on her feet for more than 2-3 hours, and is not sure how long she can sit.  (<u>Id</u>. at 519-520).

In his decision dated February 28, 2003, ALJ Hammond determined that Plaintiff has not engaged in substantial gainful activity and that she has the impairments of mild mental retardation/borderline intellectual functioning, which is severe within the meaning of the Act.  (<u>Id</u>. at 31, Findings 2-3).  The ALJ further found that Plaintiff's medically determinable impairment does not meet or medically equal the Listings and that her allegations regarding her limitations are not totally credible.  (<u>Id</u>. at 31, Findings 4-5).  Specifically, the ALJ determined that Plaintiff's condition does not meet the severity requirements of Listing 12.05 because while her IQ most likely falls within the 60 to 70 range, she does not have another severe impairment which imposes an additional and significant work-related limitation of function.  (<u>Id</u>. at 29).  The ALJ determined that Plaintiff retains

---

[4]Plaintiff acknowledged that she smokes 2-3 packs of cigarettes each day.  (<u>Id</u>. at 518).

7

the residual functional capacity to perform a broad range of simple, unskilled work at all exertional levels, has no past relevant work, and is a younger individual with a limited education. (Tr. 31, Findings 7-10). Utilizing the testimony of a vocational expert, the ALJ concluded that considering the types of work that Plaintiff is still functionally capable of performing, in combination with her age, education and work experience, she can be expected to make a vocational adjustment to work that exists in significant numbers in the national economy, such as cafeteria attendant, laundry worker, hotel housekeeper and room service clerk. (Id., Finding 11). Accordingly, the ALJ found that Plaintiff has not been under a disability at any time. (Id., Finding 12).

## III. <u>Issues on Appeal</u>[5]

A.   Whether the ALJ erred by failing to find that Plaintiff's impairments meet, equal or medically equal the requirements of Listing 12.05C?

B.   Whether the ALJ erred by failing in his obligation to develop a full and fair administrative record regarding the vocational opportunities available to Plaintiff, in violation of SSR 00-4p, by failing to ask the vocational expert ("VE") whether the evidence provided conflicts with the <u>Dictionary of Occupational Titles</u> ("DOT") and obtain a reasonable explanation for any apparent conflict?

---

[5]At the October 18, 2005 oral argument, Plaintiff's counsel conceded that there was no issue on appeal with regard to any alleged physical impairments; thus, Plaintiff's appeal is limited to issues surrounding her alleged mental impairments.

## IV.   <u>Analysis</u>

### A.   <u>Standard of Review</u>

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[6]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.   <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

---

[6]This Court's review of the Commissioner's application of legal principles is plenary.   <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

## B.   **Discussion**

An individual who applies for Social Security disability benefits must prove her disability.  20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.  20 C.F.R. §§ 404.1520, 416.920.[7]  See, e.g., Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997).  As noted supra, utilizing the five-step sequential evaluation process, ALJ Hammond found that Plaintiff's mild mental

---

[7]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

retardation/borderline intellectual functioning is a severe impairment, but that it does not meet or medically equal one of the Listings. (Tr. 31). The ALJ further determined that Plaintiff has the residual functional capacity to perform a broad range of simple, unskilled work at all exertional levels, and that she could be expected to make a vocational adjustment to work that exists in the national economy. (Id.)

**1.   Whether the ALJ erred by failing to find that Plaintiff's impairments meet, equal or medically equal Listing 12.05C?**

Plaintiff argues that the ALJ erred in finding that her impairments do not meet, equal or medically equal Listing 12.05C for mental retardation. (Doc. 14). Specifically, Plaintiff argues that: 1) given the ALJ's finding that she is mentally retarded, with valid IQ scores between 60-70, and 2) given the findings of the consultative and reviewing State Agency physicians that she suffers from additional severe mental impairments (i.e., personality disorder, anxiety and depression), the ALJ erred in concluding that she did not meet Listing 12.05C. (Id.) In support of her contention, Plaintiff relies upon the March and June 2000 hearing testimony of John W. Davis, Ph.D. ("Dr. Davis"), and the findings of State Agency physicians Drs. Hinton and Eno. (Tr. 183-196, 208-227, 601, 603, 627).

Listing 12.05C falls under § 12.00 MENTAL DISORDERS and provides that:

Mental retardation refers to significantly subaverage

11

general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; _i.e._, the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied ···· C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[8]  The regulations further explain that the required level of severity is satisfied when the following is demonstrated:

C.   A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05C.  As such, a claimant meets the criteria for presumptive disability under Section 12.05(c) when the claimant presents a valid IQ score of 60-70 inclusive _and_ evidence of an additional mental/physical impairment that has more

---

[8]Cobb v. Barnhart, 296 F. Supp. 2d 1295 (N.D. Ala. 2003); Davis v. Shalala, 985 F.2d 531 (11th Cir. 1993)(quoting Listing 12.05C). When considering whether the plaintiff has a physical or mental impairment imposing significant work-related limitation of function in addition to a low verbal scale I.Q., the Commissioner must consider the plaintiff's impairments in combination.  Davis, 985 F.2d at 533.  The issue of what constitutes "a physical or other mental impairment imposing additional and significant work-related limitation of function" was addressed in Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515-1516 (11th Cir. 1985) (considering whether the presence of chronic obstructive lung disease and exercise induced asthma provided a sufficient additional impairment to meet the second prong of Listing 12.05C):

An impairment imposes significant limitations when its effect on a claimant's ability to perform "basic work activities" is more than slight or minimal. The question under Listing 12.05C, however, is not whether the impairment is in and of itself disabling, thus, "significant" requires something less than severe within the meaning of § 404.1520(c) [of the Commissioner's Regulations].

than "minimal effect" on the claimant's ability to perform basic
work activities.  Edwards by Edwards v. Heckler, 755 F.2d 1513, 1516
(11th Cir. 1985).  The Eleventh Circuit, however, has recognized
that "a valid I.Q. score need not be conclusive of mental
retardation where the I.Q. score is inconsistent with other evidence
in the record on the claimant's daily activities and behavior."
Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992).  Thus, to
prove that she meets Listing 12.05C, Plaintiff must establish a
valid verbal, performance or full scale IQ of 60-70, must
demonstrate that retardation is a lifelong condition which
manifested itself before the age of 22, and must establish the
existence of a physical or mental impairment which imposes
additional and significant work-related limitations on her ability
to function.  Id. at 837-838.

Based upon a review of the record, the undersigned finds that
substantial evidence supports the ALJ's determination that Plaintiff
does not meet Listing 12.05C because she does not fulfill the second
requirement of having "a physical or other mental impairment
imposing additional and significant work-related limitation of
function."  20 C.F.R. Pt. 404, Subpt. App. 1, § 12.05C.  Here, the
ALJ concluded that:

> . . . medical evidence indicates that the claimant has
> mild mental retardation/borderline intellectual
> functioning, an impairment that is severe . . . .  The
> claimant has also alleged that migraine headaches and a
> nervous problem contribute to her disability. However,
> the undersigned finds that these alleged impairments are

non-severe because the record contains no credible evidence to show that these impairments significantly interfere with the claimant's ability to perform work activity.  Dr. Joshi,[9] the claimant's treating psychiatrist, has diagnosed her with a personality disorder but declined to provide any information as to how this disorder impacts the claimant's ability to function.  Dr. McCleary[10] diagnosed the claimant with a

---

[9]From 1999-2002, Plaintiff was treated by Rajani Joshi, M.D. ("Dr. Joshi") and others at the MMHC for allegations of a personality disorder, neurological evaluation (possible seizure disorder), diagnosis of borderline intellectual functioning, caffeine-induced sleep disorder with anxiety, and possible malingering. (Id. at 235-237).  Notably, in January 2002, treatment notes reveal that she was discharged with a final diagnosis of caffeine induced sleep disorder with anxiety, r/o malingering, personality disorder with mixed trait and past urinary tract infection.  (Id.)  She was admitted for poor sleep, energy, concentration and appetite, and was given individual therapy, psychological evaluation, medical monitoring and prescribed hydroxyzine.  (Id.)  At discharge, she was current with her treatment goals but was referred out because of non-SMI diagnosis malingering and because she was not keeping her appointments on a regular basis.  (Id.)  Her "behavior was reserved and had a smirk on her face. Did not say much and questioned her Dx in a somewhat smart-eleck tone." Plan: "canceled appt. scheduled . . . for 2/18/02 close file." (Id.)

[10]On March 6, 1999, Dr. McCleary examined Plaintiff (accompanied by her fiancé), upon DDS referral, and noted as follows:

She was alert, oriented to time, place and person, attentive, "only marginally motivated" (was administered a 15 item test to detect malingering of which she was only able to get 6 of 15 items suggestive of malingering such that the evaluation is "an underestimate of her current level of functioning"), demonstrated a stable affect, euphoric mood, absence of anxiety, clear and coherent thought processes, absence of loose associations, denied hallucinations (although she said she sees her dead grandmother and hears her calling her name), absence of circumstantial thinking or confusion, absence of indication of delusional ideation, no delusional ideation, normal speech rate and form, absence of fine/gross motor skill deficits, absence of evidence of pain-related behaviors, ability to follow simple auditory commands, reads/understands what is read, can copy a cube and complex cross from a model without severe distortions; however, she described herself as sad and angry with thoughts of suicide often, noting many overdoses in her past yet exhibited no anxiety to testing and has never had psychological treatment.

The results of the Wechsler Adult Intelligence Scale-revised (WAIS-R) revealed a verbal IQ 62, performance IQ 65 and full IQ 62, indicating mild mental retardation; however, Dr. McCleary concluded that this was an underestimate of her actual level of functioning due to malingering and "very poor motivation."

She was diagnosed with r/o malingering and a personality disorder

factitious disorder and indicated that this disorder
significantly impacts her daily activities and social
functioning.   However, the Administrative Law Judge
assigns little evidentiary weight to this opinion by Dr.
McCleary in light of the claimant's clear pattern of
malingering and poor credibility.   Moreover, **at the
previous hearing, Dr. John Davis, psychological expert,
testified that the claimant's malingering could possibly
be misdiagnosed as a personality disorder**.   Thus, the
undersigned concludes that the claimant's personality
disorder and/or factitious disorder are non-severe
impairments, since the record contains no credible
evidence showing how or to what extent these impairments
affect the claimant's ability to perform the mental
demands of simple, unskilled work.

* * *

. . . . the claimant's mild mental retardation/borderline
intellectual functioning is not severe enough to meet or
medically equal one of the impairments . . . .   Her
condition does not meet the severity requirements of any
Listing in section 12.05.   Since Dr. McCleary opined that
the claimant's IQ scores are valid, the Administrative
Law Judge, for purposes of this decision, has given the
claimant the benefit of the doubt and finds that her true
IQ most likely falls within the 60 to 70 range.   However,
for the reasons, discussed hereinabove, the undersigned
has concluded that the claimant does not have another
severe impairment imposing additional and significant
work-related limitation of function.   Moreover, the
undersigned is not persuaded that the claimant's
condition results in marked restriction of daily living
activities, social functioning, concentration, etc.
Thus, her impairment does not meet or equal a Listing.

(Tr. 28-29).   As such, while the ALJ agreed that Plaintiff's true

IQ falls between 60-70,[11] he concluded that she did not meet the

_____

NOS; and it was noted that she appears to have a life-long history
of mental slowness, may have problems with work pressure because she
has never worked before, but that she should respond appropriately
to supervision/coworkers.

(Id. at 96-98, 297-299).

[11]While the undersigned recognizes that the record reveals that there
were problems or questions surrounding the validity of Plaintiff's IQ test
scores and whether or not she was malingering, (Id. at 96-98, 142-144, 180,

15

second prong of Listing 12.05C because she did not have another severe mental impairment that imposed an additional and significant work-related limitation of function and her mental condition does not result in a marked restriction of activities of daily living, social functioning or concentration (<u>i.e.</u>, that her personality disorder, anxiety and depression claims, lack merit). (<u>Id</u>.)

Put simply, there is no evidence that she suffers from an additional mental impairment that imposes significant work-related limitations. At the hearing, Plaintiff testified that she can make beds, sweep and clean up and admitted she probably could work as a hotel housekeeper. <u>See</u> <u>supra</u>. Plaintiff also admitted that she can feed and dress herself, shop, cook, stand, walk, sit, lift up to 20 pounds, push/pull, bend, stoop, climb stairs, reach overhead and pick up small objects. (<u>Id.</u>)

Additionally, contrary to Plaintiff's assertions, Dr. Davis' hearing testimony does not support her claims. During the March 9, 2000 and June 5, 2000 hearings, Dr. Davis testified that:

- Plaintiff received only "[a] few incidences of treatment" for anxiety;

- Plaintiff's records showed <u>no</u> appreciable evidence of having any kind of major mental, psychological or psychiatric disorder(s);

- Plaintiff's other psychiatric diagnoses lack supporting evidence;

596-599, 606), given that the ALJ gave her the benefit of the doubt in his decision, accepting that her IQ falls between 60-70, her IQ is a "non-issue" for purposes of this appeal.

- Plaintiff has an "undeveloped work ethic" and "poor motivation;"

- He agreed that while the State Agency mental RFC assessment (that Plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration, to set realistic goals, respond appropriately to changes in a work setting and interact appropriately with the general public), was consistent with her medical records, it would merely limit her to a simple, routine, repetitive work setting.

- He agreed with Dr. Hincken's finding of "no evidence of a sign or cluster syndrome"

- He found no evidence in the record showing that Plaintiff had been systematically treated for anxiety.

- He noted that while Dr. Welsh's report[12] found that there was a marked restriction in Plaintiff's range of daily activities, the records reflect that she has some social activities. Also, he questioned how Dr. Welsh could make a judgment about Plaintiff's ability to perform work-related activities since he did not see any evidence that she had ever worked.

_____

[12]On July 28, 1999, D. Kent Welsh, Ph.D., ("Dr. Welsh"), conducted a psychological evaluation of Plaintiff in which he noted as follows:

[s]he described herself as having problems with her nerves and "being sick."  She has apparently been able to have other people meet her needs by assuming the sick role.  At present, there is an economic incentive for "being sick," but prior to her application for Social Security benefits, there was no apparent economic incentive.  Therefore, her symptoms are consistent with the diagnosis of a Factitious Disorder with Combined Psychological and Physical Signs and Symptoms (DSM-IV, 300.19).  This disorder has caused Ms. Ramos to withdraw from contact with others and to have difficulty maintaining the social functioning.  She also shows a marked restriction in her range of daily activities.  She has not demonstrated good judgment in making decisions in work related activities.  She lacks the arithmetic skills to manage her own financial affairs.

(Id. at 178-181, 389-392).

17

(Tr. 596-607).  Dr. Davis then concluded, in response to a question regarding the Listing 12.05C requirement that Plaintiff have a physical or mental impairment imposing additional and significant work-related limitations of function, that "[f]rom a psychological point of view, other than any mental limitations, I don't find any significant psychological features, past treatment, or any type of limitation or restriction[]" (i.e., that she did not meeting Listing 12.05C).  (Id. at 605).  Likewise, Dr. Davis testified at the June 2000 hearing, that there was nothing in the medical records and reports showing that Plaintiff would be unable to perform simple, repetitive type of work activity, noting that:

- Multiple, or a series of, inconsistencies exist in Plaintiff's treating physicians' records and in the MMHC records; and, that he found her allegations of hallucinations unreliable.  He concluded that her medical records reveal nothing more than someone with mild mental retardation.

- While she "could" have a personality disorder, the record did not definitively establish a personality disorder: "I think there's just a series of inconsistences[]" and malingering (or fictitious disorder) would be "an attempt to imitate a personality disorder" which "did not really exist[-]" [t]hat the person was just faking a personality disorder."

- Plaintiff's DDS mental residual functional capacity assessments and psychiatric review technique forms were correct and valid.

- While she was prescribed medications (Risperdal and Zoloft), she did not have her prescriptions filled.

(Id. at 624-630).  Accordingly, Plaintiff's reliance on Dr. Davis' testimony is misplaced.  Contrary to her assertion, Dr. Davis did

not admit that she had a personality disorder and, while he agreed with certain findings of the State Agency physicians, he concluded that she did not have any mental, psychiatric or psychological impairment that would meet the second prong of Listing 12.05C.

Moreover, while Plaintiff claims that the ALJ failed to consider other mental findings of record and that his decision does not contain an explanation of the weight given to State Agency physicians Drs. Hinton and Eno, who reviewed her case file and assigned mental limitations based on her impairments, the ALJ's decision expressly notes that he reviewed all of the evidence of record. Plaintiff even acknowledges that the ALJ "detailed examinations completed by [other] State Agency physicians in his decision[.]" (Doc. 14 at 8 (referencing the findings of consultative clinical psychologist Gerald McCleary, Lucile Williams[13] and Kent Welsh)). Also, the record reveals that Dr.

---

[13]On April 27, 1999, Plaintiff was examined by consultative clinical psychologist Dr. Williams, who found:

Plaintiff was oriented in all four spheres, well groomed and appropriately dressed, demonstrated euthymic mood, had normal affect, lacked anxiousness, speech abnormalities, loose associations, tangential or circumstantial thinking and confusion, hallucinations/delusions, had intact thought processes, normal fine and gross motor skills, normal general activity levels, social confidence and comfort, general ability to readily understand instructions, a bored attitude toward evaluation tasks, poor to fair interest and effort and a poor general approach to assessment tasks;

No hallucinations or delusions were noted, Plaintiff's affect is flat to normal, she is not anxious, mood seems euthymic, current suicidal ideation was denied (but she reported taking pills when she was younger), her own insight and understanding was poor as was her judgment, and she is not able to manage her own funds.

Plaintiff was not motivated to do her best;

Hinton's August 17, 1999 psychiatric review technique form for
Plaintiff concluded that when considering mental retardation and
autisim, anxiety related disorders, somatoform disorders and
personality disorders, **there was no evidence of an organic mental
disorder, schizophrenic, paranoid and other psychotic disorder,
affective disorders, somatoform disorders, personality disorders or
substance addiction disorders**. (Tr. 183-192). Dr. Hinton found
that Plaintiff suffers from Listing 12.05 for mental retardation
given Plaintiff's WAIS-III IQ scores (verbal 68, performance 73,
full scale 67) and Listing 12.06 anxiety related disorder (diagnosed
with anxiety). (<u>Id</u>. at 187). Relevant to Listings 12.05, 12.06,
12.07 and 12.08, Dr. Hinton concluded that she has a slight degree
of restriction of activities of daily living, a moderate degree of
difficulty maintaining social functioning and "often" deficiencies
of concentration, persistence or pace resulting in failure to
complete tasks in a timely manner (in work settings or elsewhere),
and that there was insufficient evidence of episodes of
deterioration or decompensation in work or work like settings. (<u>Id</u>.
at 190). Dr. Hinton also completed a mental residual functional
capacity assessment, concluding that Plaintiff had <u>no</u> significant
limitations in her abilities to:

---

Plaintiff was "limitedly cooperative with the evaluation process[]"
and as such, her statements "might be viewed as questionable."

(<u>Id</u>. at 141-144).

- remember locations and work-like procedures;

- understand, remember and carry out very short and simple instructions;

- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

- sustain an ordinary routine without special supervision;

- work in coordination with or proximity to others without being distracted by them;

- make simple work-related decisions;

- complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;

- ask simple questions or request assistance;

- accept instructions and respond appropriately to criticism from supervisors;

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- be aware of normal hazards and take appropriate precautions; and

- travel in unfamiliar places or use public transportation.

(Id. at 193-194).  Dr. Hinton found, however, that Plaintiff had

moderate limitations in her abilities to:

- understand, remember and carry out detailed instructions;

- maintain concentration and attention for extended periods;

- interact appropriately with the general public;

- respond appropriately to changes in the work setting; and

- set realistic goals or make plans independently of others.

(Id.) Dr. Hinton added that detailed instructions should be limited in the workplace, she can attend for two hours with regular breaks, changes in the workplace should be minimal, she will need assistance setting goals and routine contact with the general public should not be a usual job assignment. (Id. at 195).

On May 30, 2001, State Agency clinical psychologist Ellen N. Eno ("Dr. Eno") concurred with Dr. Hinton's August 17, 1999 mental residual functional capacity assessment, finding that Plaintiff has the ability to understand, remember and carry out very short/simple instructions, attend for two hour periods, ask simple questions, accept instructions, maintain socially appropriate behavior and is aware of normal hazards and can travel in unfamiliar places or use public transportation. (Tr. 209-211). Dr. Eno also completed a psychiatric review technique form on Plaintiff, evaluating Listings 12.02, 12.05 and 12.08, noting that:

- she has a borderline IQ, a diagnosis of a personality disorder, a mild limitation in activities of daily living and a moderate limitation in maintaining social functioning and maintaining concentration, persistence or pace, but no episodes of decompensation.

- her medical treatment/history (including prior diagnoses of caffeine induced sleep disorder and

22

anxiety, personality disorder with mixed traits, borderline dependent, borderline intellectual functioning, and r/o malingering), test results, education, allegations of being a slow learner and having depression with the effects of not feeling good around people, being unable to read and feeling sad, were all evaluated.

- it was found that while she can perform personal hygiene, make social contacts when she desires, shop with assistance in making change, concentrate on television shows, she does not perform household chores due to fatigue and headaches; she can also cook some things and knows how to make the bed and wash dishes but is too tired to do so, and she has limited socialization.

- her MMHC notes were assessed, which stated she did not want to work, wanted to "get a check," declined offers of vocational rehabilitation, had a desire for monetary gain and had a lack of interest in treatment and work.

(Id. at 213-227).

Additional objective medical evidence of record also confirms that Plaintiff failed to meet her burden of establishing that she meets or equals the requirements of Listing 12.05C. Plaintiff failed to establish an additional mental impairment imposing additional and significant work-related functional limitations and thus, failed to meet the second requirement of Listing 12.05C insofar as her examinations revealed that she was frequently:

- alert (Id. at 96, 179), oriented (Id. at 97, 143, 179, 206, 246-249, 251-252, 258-260, 263, 265-267, 416-418, 421, 423-426, 431-434, 497-501) and attentive (Id. at 96)

- demonstrated appropriate appearance and grooming (Id. at 142-143, 206, 238, 241-242, 244-247, 249, 251, 258-262, 265-268, 416-421, 423-426, 431-434, 470, 472-473, 497, 499-501)

23

- had normal behavior and euthymic to normal mood (Tr. 97, 144, 206, 238, 240-242, 244-247, 251, 258-261, 267-268, 431-433, 470-473, 492, 497, 499, 501), a stable appropriate affect (Id. at 97, 144, 206, 238, 240-242, 244-247, 249, 258, 260-262, 266-268, 433-434, 470-473, 492, 494, 497, 499-501) and the absence of anxiety (Id. at 97, 144)

- normal and/or spontaneous and coherent speech (Id. at 97, 142-144, 206, 238, 240-242, 244-249, 251, 258-260, 262, 266-268, 416-417, 420, 424-426, 431-434, 492, 494-495, 497-499, 501)

- normal/unimpaired memory (Id. at 238, 240-242, 245, 247-249, 251, 258-259, 266, 416-417, 424, 431-433, 492, 495, 498, 500-501)

- normal, clear, logical, coherent thought processes (Id. at 97, 144, 206, 238, 241-242, 244-245, 247-249, 251, 258, 260, 266-267, 416, 418, 424-425, 431, 433-434, 492, 494-495, 497-501), fair insight (Tr. 247-248, 251, 258, 260, 266, 433-434, 501), fair judgment (Id. at 247-248, 251, 258, 260, 266, 433-434, 501), and normal concentration (Id. at 238, 242-242, 245, 247-249, 258, 260, 266, 268, 432-434, 501)

- absence of loose associations, tangential or circumstantial thinking or confusion (Id. at 97, 144, 206) and absence of indications of hallucinations[14] or delusions (Id. at 97, 144, 179, 206, 238, 240-242, 244-245, 247, 249, 251, 258, 260, 266-267, 416, 418, 424-425, 431, 433-434, 494-495, 497-501)

- normal fine and gross motor skills (Id. at 97, 142, 206), normal general activity levels (Tr. 142), average energy (Id. at 251, 258-259, 261, 432-433, 499, 501), and absence of evidence of pain-related behaviors (Id. at 97)

- ability to follow simple and complex verbal commands

---

[14]While Plaintiff claimed auditory hallucinations and playing with imaginary friends, more often than not, she denied any hallucinations or delusions in her reports medical professionals.  See supra.

(Id. at 206), read and understand what is read, and copy a cube and copy a cross without severe distortions (Id. at 97), social confidence and comfort (Id. at 142), ability to generally readily understand instructions (Tr. 142)

- her mental status was found to be stable (Id. at 246, 258, 260-261, 266-268, 416, 418-419, 424-426, 431, 434, 497, 499)

While Dr. Davis acknowledged that Plaintiff "might" suffer from a personality disorder, the record does not reflect such, and as noted supra, Dr. Davis testified that other psychiatric diagnoses including that of a personality disorder, simply lacked support in the record. (Tr. 596-607, 628-629). Dr. Davis also testified that Plaintiff did not meet the requirements of a Listing and that the record did not support disabling impairments for her. (Id. at 624-630). In so finding, he noted many inconsistences in the records of her treating physicians and that her allegations of hallucinations were simply unreliable. (Id.)

To be considered disabling, a mental disorder impairment must be accompanied by work-related limitations (i.e., medical evidence of demonstrable clinical signs and laboratory findings concerning restrictions of daily activities, constriction of interests, deterioration of personal habits and an impaired ability to relate to others). 20 C.F.R. Listing 12.00A. In this case, the record reveals, first, that Plaintiff is able to understand, carry out and remember short and simple instructions, and respond appropriately to supervision, coworkers and work pressure in a work setting, which

25

supports the ALJ's finding that she has the capacity to perform substantial gainful activity. 20 C.F.R. §§ 404.1545(c), 416.945(c).

Second, Dr. McCleary concluded that Plaintiff could respond appropriately to supervision and coworkers and might have difficulty with work pressure only because she had never worked before. See supra.

Third, two State Agency clinical psychologists concluded that Plaintiff had no significant limitations in her abilities to: remember locations and work-like procedures; understand, remember and carry out short/simple instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with, or proximity to, others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public

transportation.  See supra.  The State Agency physicians found that Plaintiff had moderate limitations only in her abilities to: understand, remember and carry out detailed instructions; maintain concentration and attention for extended periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Id.)

Furthermore, Richard Freemen, the VE, was questioned regarding these mental residual functional capacity assessments at the administrative hearing, and he testified that the assessments would not preclude Plaintiff from performing the jobs he identified.  (Tr. 524).  Likewise, Dr. Davis testified that these assessments were consistent with the medical record and would merely limit Plaintiff to simple, routine, repetitive work.  (Id. at 599-603).  Similarly, it was noted that Plaintiff has an economic incentive for being sick, as she reported that she did not want to work, that she thought her step-father could support her and declined vocational rehabilitation assistance in searching for employment.  (Tr. 180, 250, 259, 261-262).  See also supra.  Also, when Plaintiff took her medication[15] and complied with prescribed treatment, she reported that she was doing well, feeling better, experiencing an improved mood and that her medication was somewhat effective.  (Tr. 241, 258,

---

[15]Plaintiff was noncompliant with her medications at times, and she also failed to regularly attend appointments, and on once occasion was described as displaying a "smart aleck" attitude.  (Id. at 205, 236-237, 239, 241, 250, 432, 512-513).

261, 434, 591).

Finally, at the January 2, 2003 administrative hearing, Plaintiff testified that she knew how to make a bed, clean a bathroom, sweep with a broom and empty the garbage. She also acknowledged that she could probably work as a hotel maid. (Id. at 509-511, 517). Additionally, the record evidence establishes that Plaintiff is able to engage in significant daily activities such as caring for her own personal needs, cleaning house, maintaining her home, limited cooking, sitting around and watching television, visiting with others, attending parades, going to the mall to pay a bill, shopping with assistance, and attending her examinations without assistance/unaccompanied. (Id. at 76-77, 96, 142, 144, 205-207, 249, 273-275, 283-284, 510-511, 516-517, 592). Plaintiff is also able to maintain a relationship, as she reported that she planned to be married. (Id. at 96, 141). Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision that Plaintiff does not meet, equal or medically equal Listing 12.05C, due to the absence of a severe mental impairment imposing additional and significant work-related limitations of function on her.

**2.   Whether the ALJ erred by failing in his obligation to develop a full and fair administrative record regarding the vocational opportunities available to Plaintiff in violation of SSR 00-4p, by failing to ask the vocational expert ("VE") whether the evidence conflicts with the Dictionary of Occupational Titles ("DOT"), and by failing to obtain a reasonable explanation for any apparent conflict?**

Plaintiff argues that the ALJ violated SSR 00-4p[16] because he failed to fully develop the record with regard to the vocational opportunities available to her, as well as ask the VE whether the evidence conflicted with the DOT, and if so, obtain a reasonable explanation for any apparent conflict. (Doc. 14 at 10-14). Because an administrative hearing is not adversarial, an ALJ has a duty to develop the record fully and fairly. Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (citing Graham v. Apfel, 129 F.3d 1420, 1422-1423 (11th Cir. 1997)); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). While the ALJ has a duty to develop the record and is bound to make every reasonable effort to obtain all the medical evidence necessary to make a determination, 20 C.F.R. § 416.912(d), he is not charged with making Plaintiff's case for her. Plaintiff has the burden of proving she is disabled. 20 C.F.R. § 416.912(a) and (c). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987); Bloodsworth, 703 F.2d at 1240. Upon a review of the record evidence, the undersigned finds that the ALJ had

---

[16]Requires an ALJ to affirmatively inquire about "any possible conflict" between the evidence offered by a VE and information provided in the Dictionary of Occupational Titles ("DOT").

sufficient evidence to assess Plaintiff's abilities.

Specifically, because Plaintiff had no past relevant work, the burden shifted to the ALJ at step five of the sequential evaluation process to determine whether there was a significant number of jobs in existence in the regional and national economy which she could perform - given her age, education, previous work experience and residual functional capacity. <u>Hale</u>, 831 F.2d at 1011. At step five, the ALJ is guided by the <u>Medical-Vocational Guidelines</u> (the "Grids"). The ALJ found that Plaintiff retains the residual functional capacity to perform work reduced by a limitation to simple, unskilled work and thus, a VE was called to testify regarding the jobs that she could perform with this limitation. (Tr. 31, 522-530). <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077-1078 (11th Cir. 1996).

At the administrative hearing, VE Freeman testified that an individual of Plaintiff's age, education, past relevant work experience and residual functional capacity could perform jobs in the national/regional economies, in numbers the ALJ found to be significant, citing the jobs of cafeteria attendant, clothing launderer, hotel maid/housekeeper and room service clerk as examples. (Tr. 522-523). Plaintiff argues that because the ALJ adopted the VE's testimony without asking him about any possible conflict, the non-disability determination cannot be supported by substantial evidence as a matter of law. Her argument, however, is

unavailing.

Here, SSR 00-4p was simply not triggered and can accordingly provide no ground for error.  Plaintiff cannot look to SSR 00-4p as a source of relief because it provides that _when_ an apparent unresolved conflict between VE evidence and the DOT exists, the ALJ must elicit a reasonable explanation for the conflict before relying upon the VE evidence to support a disability decision.  Although the VE did provide testimony that identified certain jobs, he did not violate SSR 00-4p because he did not provide evidence about the requirements of these jobs.  SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000).  Thus, the ALJ was not required to ask the VE about any DOT conflict.[17]  See, e.g., Jackson v. Barnhart, 120 Fed. Appx. 904 (3rd Cir. Jan. 6, 2005) (unpublished).  Additionally, Plaintiff has not alleged any specific conflict, and a review of the record does not reveal the existence of any apparent conflict.  Accordingly, under the circumstances, the ALJ's failure to question the VE about a possible conflict was not error given the complete absence of evidence of an apparent unresolved conflict.

**V.   Conclusion**

For the reasons set forth and upon consideration of the administrative record and memoranda of the parties, it is

---

[17]The DOT is not the sole source of admissible information concerning jobs and is not dispositive.  Jones v. Apfel, 190 F.3d 1224, 1230 (11th Cir. 1999) (holding that when the VE's testimony conflicts with the DOT, it "trumps" the DOT). An ALJ may rely solely on the VE's testimony over the DOT; reliance on the DOT is within the discretion of the ALJ.  Id. at n. 2.

recommended that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income benefits, is due to be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation</u>.

**DONE** this the **31st** day of **March, 2006.**

**      /s/ Sonja F. Bivins      **
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.  **<u>Objection</u>**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.  **<u>Opposing party's response to the objection.</u>**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**.
Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate
judge finds that the tapes and original records in this action are
adequate for purposes of review.   Any party planning to object to
this recommendation, but unable to pay the fee for a transcript, is
advised that a judicial determination that transcription is
necessary is required before the United States will pay the cost of
the transcript.

                                   ____/s/ SONJA F. BIVINS____
                                   **UNITED STATES MAGISTRATE JUDGE**